993 So.2d 907 (2008)
Mohammad SHARIFI
v.
STATE of Alabama.
CR-04-1185.
Court of Criminal Appeals of Alabama.
February 1, 2008.
Rehearing Denied March 21, 2008.
Certiorari Denied May 16, 2008 Alabama Supreme Court 1070940.
*911 James E. McGuirk and Stephen A. Strickland, Birmingham, for appellant.
Troy King, atty. gen., and Richard D. Anderson, asst. atty. gen., for appellee.
WISE, Judge.
The appellant, Mohammad Sharifi, was convicted of murdering Sarah Kay Smith Sharifi and Derrick Brown by one act or pursuant to one scheme or course of conduct, an offense defined as capital by § 13A-5-40(a)(10), Ala.Code 1975. The jury, by a vote of 10 to 2, recommended that Sharifi be sentenced to death. The circuit court followed the jury's recommendation and sentenced Sharifi to death. This appeal followed.
The State's evidence tended to show the following: Sharifi, an Iranian national, came to Huntsville in December 1998 on a six-month tourist visa. Before the visa expired he married Sarah Kay Smith, an American citizen. Following his marriage, Sharifi petitioned to change his immigration status from "tourist" to "legal alien."
Sarah and Sharifi separated in late 1999. Thereafter, Sarah, accompanied by Derrick Brown, met with Sharifi's caseworker at the Immigration and Naturalization Service (now the Department of Citizenship and Immigration Services). As a result of that meeting, Sharifi's petition to become a legal alien was denied, and his immigration status was changed to "illegal alien," because his tourist visa had expired.
Sharifi purchased a .25-caliber pistol on December 6, 1999. On December 13, 1999, Sharifi went to the apartment he had shared with Sarah and forced his way inside. The Huntsville Police were called to the scene, and Sharifi was prevented from removing anything other than his clothes from the apartment. Sharifi left, promising to return. After Sharifi left, Sarah had the locks on the doors to the apartment changed. When Sharifi returned later that same day and discovered that the locks had been changed, he became upset. *912 Sharifi became even more agitated when he learned that although he was not allowed inside the apartment, Derrick Brown was inside. Sharifi demanded of the apartment manager that Brown be removed.
The manager of the apartment complex filed a missing-person report with the Huntsville Police on December 17, 1999, because the manager had not seen Sarah in several days. December 13, 1999, was the last day Sarah and Brown were seen alive. On December 26, 1999, Sarah Sharifi's body was found on the banks of the Tennessee River; it was wrapped in black plastic bags and tied with an electrical cord. On January 1, 2000, Brown's body was found in the Tennessee River; it was partially wrapped in black plastic bags and tied with an electrical cord. Both Sarah and Brown had been shot in the head. Subsequent forensic testing determined that the gun used to shoot both victims was the gun Sharifi purchased in December 1999.
On December 28, 1999, the FBI arrested Sharifi in Los Angeles, California, on an unlawful-flight-to-avoid-prosecution warrant relative to Sarah's murder. In Sharifi's possession at the time of his arrest were the murder weapon, a license tag from Brown's vehicle, Brown's driver's license, one of Brown's credit cards, and a pair of sandals that was later determined to have Sarah's blood on them.
Sharifi was extradited to Alabama and was incarcerated in the Madison County jail awaiting trial for the two murders. During his incarceration, Sharifi met Tasha Borner, another inmate. Sharifi wrote Borner a number of letters professing his love for her and asking her to testify that they were together on the night of December 13, 1999. Borner, who did not meet Sharifi until 2002, turned the letters over to the district attorney and was given a plea deal in exchange for her testimony against Sharifi.
Sharifi's defense was that he was in Los Angeles, California, at the time of the murders. Aghaishahabdin Moughari testified that Sharifi came by his house in Huntsville on December 13, 1999, that Sharifi's car was loaded with his possessions, and that he told him that he was moving to California to find work. Moughari also testified that on December 14, 1999, Sarah came by his house looking for Sharifi.
Sharifi's father, Hossain Sharifi, testified that at the time of the murders he was living in Iran and that he spoke to Sharifi everyday at approximately 2:00 p.m. Huntsville time. He said that on December 13, 1999, he telephoned the apartment Sharifi had shared with Sarah, and a man answered the telephone and gave the phone to Sarah. He further testified that on December 15, 1999, Sharifi telephoned him in Iran and told him that he had moved to California.
The jury chose to believe the State's version of the events and convicted Sharifi of murdering Sarah and Brown during one act or pursuant to one course of conduct. After a separate sentencing hearing, the jury, by a vote of 10  2, recommended that Sharifi be sentenced to death. The court then issued an order sentencing Sharifi to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala. Code 1975.

Standard of Review
Because Sharifi has been sentenced to death, this Court must review the record for any "plain error." Rule 45A, Ala. R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error *913 or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
As we stated in Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999):
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala. 1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
820 So.2d at 121-22.

Guilt-Phase Issues

I.
Sharifi's first 10 issues in his brief to this Court concern the Vienna Convention on Consular Relations ("the Vienna Convention"). Specifically, Sharifi argues that the State violated Article 36 of the Vienna Convention and that we must either reverse and set aside his conviction and order a new trial or, at a minimum, prohibit the death penalty from being enforced in this case.
In February 2003, Sharifi moved that the indictment against him be dismissed because, he says, he was not informed of his right under the Vienna Convention to contact Iranian officials when he was arrested. This motion was denied in June 2004. Sharifi also moved in February 2003 that the State be prohibited from seeking the death penalty because the State violated Article 36 of the Vienna Convention. That motion was likewise denied.
The Vienna Convention is a multilateral treaty that was ratified by the United States in 1969. The treaty regulates consular activities for countries that are signatories to the treaty and provides that if a national, i.e., a citizen of a country, is arrested in a foreign country that country will notify the foreign national's embassy and will make the arrested person accessible to the foreign officials.[1] Article 36 of the Vienna Convention provides:
"1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
"(a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access *914 to consular officers of the sending State;
"(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
"(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.
"2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended."
Specifically, Sharifi argues that Article 36 of the Vienna Convention creates individual rights that can be enforced in a court of law, rights, he asserts, that are equivalent to constitutional rights, and rights that were violated in this case. In effect, Sharifi urges this Court to adopt the rationale of the United States Court of Appeals for the Seventh Circuit in Jogi v. Voges, 480 F.3d 822 (7th Cir.2007), a rationale that has not been adopted by the majority of the courts that have considered this issue.
In Jogi v. Voges, the United States Court of Appeals for the Seventh Circuit, after noting that two circuits disagreed with its logic, held that the Vienna Convention confers individual rights on visiting foreign nationals. The court stated:
"We conclude that even though many if not most parts of the Vienna Convention address only state-to-state matters, Article 36 confers individual rights on detained nationals. Although international treaties as a rule do not create individual rights, see [United States v.] Chaparro-Alcantara, 226 F.3d [616] at 620-21 [(7th Cir.2000)], Sosa [v. Alvarez-Machain, 542 U.S. 692 (2004)] recognizes that international law in general, and thus treaties in particular, occasionally do so, see [Sosa] 124 S.Ct. at 2756."
480 F.3d at 834.
However, the United States Courts of Appeal for the Fifth and Ninth Circuits have disagreed with the Jogi court's holding. See United States v. Jimenez-Nava, 243 F.3d 192 (5th Cir.2001), and Cornejo v. County of San Diego, 504 F.3d 853 (9th Cir.2007).
In Jimenez-Nava, the United States Court of Appeals for the Fifth Circuit stated:
"Ratified treaties become the law of the land on an equal footing with federal statutes. U.S. Const. art. VI, cl. 2. They are to be construed initially according to their terms. United States v. Alvarez-Machain, 504 U.S. 655, 663, 112 S.Ct. *915 2188, 2193, 119 L.Ed.2d 441 (1992). Treaty construction is a particularly sensitive business because international agreements should be consistently interpreted among the signatories. `Treaties are contracts between or among independent nations.' United States v. Zabaneh, 837 F.2d 1249, 1261 (5th Cir. 1988). As such, they do not generally create rights that are enforceable in the courts. United States v. Li, 206 F.3d 56, 60 (1st Cir.2000); see also Goldstar v. United States, 967 F.2d 965, 968 (4th Cir.1992) (`International treaties are not presumed to create rights that are privately enforceable'); Matta-Ballesteros v. Henman, 896 F.2d 255, 259 (7th Cir. 1990) (`It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved.').
"For enforcement of its provisions, a treaty depends `on the interest and honor of the governments which are parties to it.' Head Money Cases, 112 U.S. 580, 598, 5 S.Ct. 247, 254, 28 L.Ed. 798 (1884). `[I]nfraction becomes the subject of international negotiations and reclamations.' Id. (`It is obvious that with all this the judicial courts have nothing to do and can give no redress.'). See also United States v. Williams, 617 F.2d 1063, 1090 (5th Cir.1980) (`[R]ights under international common law must belong to sovereign nations, not to individuals, just as treaty rights are the rights of the sovereign.').
"Against the backdrop of these general principles, the Vienna Convention appears to be a standard treaty whose purpose is to facilitate consular activity in receiving states. The Preamble states:
"`Believing that an international convention on consular relations, privileges and immunities would also contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems, [and] realizing that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States ... (emphasis added).
"This language would appear to preclude any possibility that individuals may benefit from it when they travel abroad, even, perhaps, if they are among the consular corps. Moreover, only one article out of 79 in the Treaty even arguably protects individual non-consular officials. Article 36, titled `Communication and Contact With Nationals of Receiving State,' provides:
"`1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
"`. . .
"`(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;
"`(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for *916 his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking an action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.
"`2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.'
"Principally because of the references to `rights' in Article 36, the circuit courts have so far declined to decide whether the Vienna Convention intended to enact individually enforceable rights of consultation. The Supreme Court, in dicta, has also held the question open. Breard v. Greene, 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998).
"A strong argument has been made that such diffidence is unnecessary and that the Vienna Convention is not ambiguous as to whether it creates private rights. In Li, Judges Selya and Boudin stated:
"`Nothing in [the] text explicitly provides for judicial enforcement of... consular access provisions at the behest of private litigants. Of course, there are references in the treaties to a "right" of access, but these references are easily explainable. The contract States are granting each other rights, and telling future detainees that they have a "right" to communicate with their consul is a means of implementing the treaty obligations as between States. Any other way of phrasing the promise as to what will be said to detainees would be artificial and awkward.'
"Li, 206 F.3d at 60, 66. (Selya, J. & Boudin, J., concurring). In any event, as these judges pointed out, even if the treaty is ambiguous, the presumption against implying private rights comes into play. Finally, as both the majority and concurring judges in Li recognized, the U.S. State Department has consistently taken the position that the Vienna Convention does not establish rights of individuals, but only state-to-state rights and obligations. The State Department's view of treaty interpretation is entitled to substantial deference. Li, 206 F.3d at 63-66.
"Jimenez-Nava's arguments in support of individually enforceable rights ultimately emphasize the treaty's ambiguity. First, by dwelling on the plain language concerning `rights' in Article 36, Jimenez-Nava must discount the equally plain language in the Preamble that the treaty's purpose `is not to benefit individuals.' Appellant would confine the limitation to consular officials, but that interpretive route hardly assists him, since consular officials are the specific beneficiaries of many of the treaty provisions. If the treaty cannot benefit them by creating individually enforceable rights, how can it intend to confer enforceable rights on all foreign nationals detained in the receiving state?
"Second, while acknowledging the general rule against implication of personal rights in treaties, Jimenez-Nava notes that, like any agreement, treaties may explicitly confer individual rights. He cites as an example [the] Supreme Court's construction of an extradition treaty in United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 *917 (1886). That case is inapposite, however, for an explicit purpose of the treaty in Rauscher was to govern `the giving up of criminals, fugitives from justice in certain cases' Id. at 410, 7 S.Ct. at 236. Unlike the Vienna Convention, the purpose and provisions of the extradition treaty related directly to the individual right asserted. Id. at 410, 7 S.Ct. at 236. Rauscher demonstrates at most the necessity for careful interpretation of each treaty.
"In his final thrust, Jimenez-Nava points out that the State Department's manual on the treatment of foreign nationals advises arresting officers to inform detainees of their right to consular communication pursuant to the treaty. U.S. Dept. of State, Foreign Affairs Manual § 411 (1994). Further, a `Memorandum of Understanding on Consular Protection of Mexican and United States Nationals' was entered into between this country and Mexico to adopt procedures and views concerning communication between consuls and foreign nationals. Memorandum of Understanding, May 7, 1996, Dept. of State File No. P96 0065-0984/0987. Such documents do no more than express this country's laudable determination to abide by the treaty. But the implementation of the treaty by the Federal government is wholly different from the implication that it may be enforced in court by individual detainees.
"The sum of Jimenez-Nava's arguments fails to lead to an ineluctable conclusion that Article 36 creates judicially enforceable rights of consultation between a detained foreign national and his consular office. Thus, the presumption against such rights ought to be conclusive."
243 F.3d at 195-98.
In Cornejo v. County of San Diego, the United States Court of Appeals for the Ninth Circuit stated:
"We conclude, therefore, that the unmistakable focus of Article 36 is on consular functions. The privileges discussed are explicitly those relating to the consular post. They are manifestly important, because Article 36 provides for communication and contact by sending States with their nationals who are in trouble in a foreign country. However, the signatory States did not choose to delegate enforcement of Article 36 even to their own consular officials. They plainly did not do so to individual foreign nationals. For all these reasons, we cannot see unambiguous clarity in the language of Article 36 implying that the States parties to the Convention conferred a private, judicially enforceable right upon individuals. Gonzaga [University v. Doe], 536 U.S. [273] at 283-84, 122 S.Ct. 2268 [(2002)].
"This conclusion is buttressed by the Convention as a whole, the contemporaneous understanding of Congress in ratifying it as well as the view of the Department of State, and the uniform practice of States implementing it over the years.
"The Vienna Convention on Consular Relations is an agreement among States whose subject matter`Consular Relations'is quintessentially State-to-State. Except for its final provisions, the Convention's articles all have to do with consular posts. Indeed, the Preamble notes the belief of the States parties that `an international convention on consular relations, privileges and immunities would ... contribute to the development of friendly relations among nations, irrespective of their differing constitutional and social systems'; and their realization that `the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient *918 performance of functions by consular posts on behalf of their respective States.' Cf. Gonzaga, 536 U.S. at 284, 122 S.Ct. 2268 (to imply enforceable private rights, a statute's `text must be "phrased in terms of the person benefitted."') (quoting Cannon v. Univ. of Chicago, 441 U.S. 677, 692 n. 13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). As the International Court of Justice explained, the Convention establishes an `interrelated regime' of international legal obligations in order to protect, and facilitate the work of, consular officers. LaGrand Case (Germany v. U.S.), 2001 I.C.J. 466, 492 [paragraph] 74 (June 27)."
504 F.3d at 860-861.
Many other courts have declined to address this specific issue but have held that the remedies of suppression of evidence or the dismissal of an indictment are not appropriate remedies for a nation's violation of the Vienna Convention. The United States Court of Appeals for the Eighth Circuit in United States v. Ortiz, 315 F.3d 873 (8th Cir.2002), stated:
"Again, even assuming that the Convention creates individually enforceable rights, this conclusion does not follow. There is no causal or logical connection at all between the penalty imposed on defendants and violation of the Vienna Convention. The death penalty is provided by statute. It comes into the case, of course, only after defendants are convicted.... The Convention itself says nothing about the appropriateness of penalties, and certainly does not provide that the death penalty is excluded if the Convention is violated. We do not believe that courts are authorized to create such a remedy."
315 F.3d at 887. See also United States v. Duarte-Acero, 296 F.3d 1277, 1282 (11th Cir.2002) ("[T]he Convention nowhere suggests that the dismissal of an indictment is an appropriate remedy for a violation. See United States v. Page, 232 F.3d 536, 540 (6th Cir.2000); Li, 206 F.3d at 62."); United States v. Lawal, 231 F.3d 1045, 1048 (7th Cir.2000) ("In [United States v.] Chaparro-Alcantara, [226 F.3d 616 (7th Cir.2000),] we determined that since there is no general exclusionary rule for international law violations, suppression of evidence is appropriate `only when the treaty provides for that remedy.' See 226 F.3d at 623-24. We read Article 36 as not providing such an extraordinary remedy. See Id. at 624-25."); United States v. Minjares-Alvarez, 264 F.3d 980, 986-87 (10th Cir.2001) ("There is no evidence that the Vienna Convention's drafters intended to remedy violations of Article 36 through the suppression of evidence."); Garcia v. State, 117 Nev. 124, 128, 17 P.3d 994, 997 (2001) ("The State Department has rejected the proposition that Vienna Convention violations warrant evidence suppression or case dismissal, and instead has concluded that the only remedies are diplomatic or political or exist between states under international law.").
The United States Court of Appeals for the Eleventh Circuit, which includes Alabama, has indicated that "[e]ven if Article 36 creates rights enforceable by individuals, other circuits have held that the remedies available for a violation of Article 36 do not include the suppression of evidence or the dismissal of an indictment.... We would follow the lead of these circuits." United States v. Cordoba-Mosquera, 212 F.3d 1194, 1195-96 (11th Cir.2000).
"Extra-textual sources lead us to the same conclusion. First, the State Department has consistently stated that the only remedies for a violation of the Vienna Convention are diplomatic, political, or derived from international law. [United States v.] Emueqbunam, 268 F.3d [377] at 392 [(6th Cir.2001)]; *919 [United States v.] Li, 206 F.3d [56] at 63-64 [(1st Cir.2000)]; [United States v.] Jimenez-Nava, 243 F.3d [192] at 197 [(5th Cir.2001)]. And the State Department's interpretation of a treaty is entitled to great deference. El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 168, 119 S.Ct. 662, 671, 142 L.Ed.2d 576 (1999); Emuegbunam, 268 F.3d at 392; United States v. De La Pava, 268 F.3d 157, 165 (2nd Cir.2001); Li, 206 F.3d at 63. Furthermore, no party to the Vienna Convention has dismissed a criminal charge based on a violation of Article 36. Emuegbunam, 268 F.3d at 393; [United States v.] Page, 232 F.3d [536] at 541 [(6th Cir. 2000)]; Li, 206 F.3d at 65. Indeed, two parties, Italy and Australia, have specifically rejected that possibility. Page, 232 F.3d at 541; United States v. Lombera-Camorlinga, 206 F.3d 882, 888 (9th Cir. 2000) (en banc). And `international agreements should be consistently interpreted among the signatories.' Jimenez-Nava, 243 F.3d at 195."
United States v. Duarte-Acero, 296 F.3d 1277, 1282 (11th Cir.2002).
The United States Supreme Court in Sanchez-Llamas v. Oregon, 548 U.S. 331, 126 S.Ct. 2669, 165 L.Ed.2d 557 (2006), also declined to address this issue.[2] The Court stated:
"Because we conclude that Sanchez-Llamas and Bustillo are not in any event entitled to relief on their claims, we find it unnecessary to resolve the question whether the Vienna Convention grants individuals enforceable rights....
"... The Convention does not prescribe specific remedies for violations of Article 36. Rather, it expressly leaves the implementation of Article 36 to domestic law: Rights under Article 36 are to `be exercised in conformity with the laws and regulations of the receiving State.' Art. 36(2), 21 U.S.T., at 101."
548 U.S. at 343, 126 S.Ct. at 2677-78.
Even if we were to hold that the Vienna Convention confers individual enforceable rights, the remedies that Sharifi seeks  setting aside his conviction, ordering a new trial, or prohibiting the death penaltyare not remedies available for a violation of the Vienna Convention.
Moreover, Iran has not maintained an embassy in the United States since the United States severed all diplomatic relations with that country on April 7, 1980, and ordered all Iranian officials to leave the United States. On September 26, 2001, Sharifi's attorneys notified the court that they had had contact with officials at the Iranian Interest Section of the Pakistan Embassy. Sharifi's attorneys then moved that they be allowed funds to travel to Washington, D.C., to meet with these officials. That motion was granted. Again in February 2002, counsel requested that officials from the Iranian Interest Section be given access to Sharifi. That motion was also granted. Another similar motion was filed and granted in July 2004. It is clear that although Sharifi may not have had "immediate" access to Iranian officials, Sharifi did have frequent meetings with the Iranian Interest Section of the Pakistan Embassy. These officials also attempted to assist Sharifi's counsel in obtaining travel documents to Iran but were unsuccessful.
For the foregoing reasons, we find that Sharifi is due no relief on this claim.

II.
Sharifi next argues that the United States bilateral treaty with Iran creates *920 individual rights that can be enforced in a court of law. Sharifi's entire argument on this issue consists of the following: "The United States signed a bi-lateral treaty with Iran guaranteeing similar rights provided by the [Vienna Convention]. See Article II of 8 U.S.T. 899. For the same reasons that the [Vienna Convention] creates an individual right that can be enforced, the same can be said for this bilateral treaty. See Issues I-VI. Sharifi is entitled to relief." (Sharifi's brief at page 59-60.)
On August 15, 1955, the United States and Iran entered into a "Treaty of Amity, Economic Relations, and Consular Rights between the United States of America and Iran." This treaty was ratified by the Untied States Senate on July 11, 1956. Article II of the treaty states, in part:
"1. Nationals of either High Contracting Party shall be permitted, upon terms no less favorable than those accorded to nationals of any third country, to enter and remain in the territories of the other High Contracting party for the purpose of carrying on trade between their own country and the territories of such other High Contracting Party and engaging in related commercial activities, and for the purpose of developing and directing the operations of an enterprise in which they have invested, or in which they are actively in the process of investing, a substantial amount of capital.
". . . .
"4. Nationals of either High Contracting Party shall receive the most constant protection and security within the territories of the other High Contracting Party. When any such national is in custody, he shall in every respect receive reasonable and humane treatment; and, on his demand, the diplomatic or consular representative of his country shall without unnecessary delay be notified and accorded full opportunity to safeguard his interests. He shall be promptly informed of the accusations against him, allowed all facilities reasonably necessary to his defense and given a prompt and impartial disposition of his case."
(Emphasis added.)
Our research has revealed no case that has applied this treaty to circumstances similar to those presented in this case. Indeed, the language of the treaty appears to limit its application to those nationals who have invested in enterprises in this country and are in this country to oversee those enterprises. Moreover, as stated above, even if such rights were created by this treaty the remedies that Sharifi seeks are not available to him. Thus, Sharifi is due no relief on this claim.

III.
Sharifi next argues that Article 7 of the International Covenant on Civil and Political Rights ("the ICCPR") provides that "`[n]o one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment"' and that "[w]hen the Senate ratified the ICCPR, it declared that this phrase meant `the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States."' (Sharifi's brief at page 62.) He asserts that the extended periods of time inmates spend incarcerated on death row constitutes cruel and unusual punishment and violates the ICCPR.
"[A] treaty such as the ICCPR does not automatically supersede local laws that are inconsistent with it unless the treaty provisions are self-executing. Fujii v. California, 38 Cal.2d 718, 242 P.2d 617, 620 (1952); see also Foster v. Neilson, 2 Pet. 253, 27 U.S. 253, 314, 7 L.Ed. 415 *921 (1829). In order to determine whether a treaty is self-executing, we must first look to the intent of the signatory parties as manifested by the language of the treaty. People of Saipan v. U.S. Dep't of Interior, 502 F.2d 90, 97 (9th Cir.1974), cert. denied, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); White v. Paulsen, 997 F.Supp. 1380, 1385-86 (E.D.Wash.1998); Fujii, 242 P.2d at 620. If the parties' intent is unclear from the language of the treaty, then we must look to the circumstances surrounding its execution. People of Saipan, 502 F.2d at 97; Fujii, 242 P.2d at 620.
"`In order for a treaty provision to be operative without the aid of implementing legislation and to have the force and effect of a statute, it must appear that the framers of the treaty intended to prescribe a rule that, standing alone, would be enforceable in the courts.' Fujii, 242 P.2d at 620; see also People of Saipan, 502 F.2d at 97.
"But the ICCPR is not self-executing, and Congress has not enacted implementing legislation. See Sosa v. Alvarez-Machain, 542 U.S. 692, 735, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (the United States ratified the ICCPR on the express understanding that it was not self-executing and did not create enforceable obligations); Beazley v. Johnson, 242 F.3d 248, 267-68 (5th Cir.), cert. denied sub nom. Beazley v. Cockrell, 534 U.S. 945, 122 S.Ct. 329, 151 L.Ed.2d 243 (2001) (citing cases and other sources indicating that the ICCPR is not self-executing); Hawkins v. Comparet-Cassani, 33 F.Supp.2d 1244, 1257 (C.D.Cal.1999) (noting that Congress has not enacted implementing legislation for the ICCPR), rev'd on other grounds, 251 F.3d 1230 (9th Cir.2001); In re Cheung, 968 F.Supp. 791, 803 n. 17 (D.Conn.1997) (noting that the Senate ratified the ICCPR with the express proviso that it was not self-executing); 138 Cong. Rec. S4781, S4784 (daily ed. Apr. 2, 1992); but see Ex parte Pressley, 770 So.2d 143, 148 (Ala.) (noting that although the Senate declared that the ICCPR was not self-executing, the Senate's intent was to clarify that the ICCPR did not create a private cause of action), cert. denied, 531 U.S. 931, 121 S.Ct. 313, 148 L.Ed.2d 251 (2000). Therefore, Hegney may not rely on the ICCPR as being incorporated into our domestic law; the ICCPR provisions relied on by Hegney do not operate to invalidate our domestic law."
In re Hegney, 138 Wash.App. 511, 539-40, 158 P.3d 1193, 1207 (2007).
Indeed, in Ex parte Pressley, 770 So.2d 143 (Ala.2000), the Alabama Supreme Court noted that the ICCPR created no individual right of action. The Court stated:
"A treaty is self-executing and creates an individual right of action when it expressly or impliedly creates that right. However, the United States Senate declared that the ICCPR was not self-executing, stating that the declaration was to `clarify that the Covenant will not create a private cause of action in U.S. Courts.' `International Covenant on Civil and Political Rights,' S. Exec. Rept., no. 102-23, 102d Congress, 2d Session 15 (1992)."
770 So.2d at 148 n. 3. Therefore, Sharifi is due no relief on this claim.

IV.
Sharifi next argues that he was denied his right to a speedy trial as guaranteed by the Sixth Amendment to the United States Constitution. Specifically, Sharifi argues that the 61-month delay between his arrest and trial was prejudicial and *922 resulted in the denial of his right to a speedy trial.
In determining whether a defendant has been denied his constitutional right to a speedy trial, we apply the test announced by the United States Supreme Court in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). We consider the following four factors: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.
The Alabama Supreme Court in Ex parte Walker, 928 So.2d 259, 263 (Ala. 2005), stated:
"`A single factor is not necessarily determinative, because this is a "balancing test, in which the conduct of both the prosecution and the defense are weighed."' Ex parte Clopton, 656 So.2d [1243] at 1245 [(Ala.1985)] (quoting Barker, 407 U.S. at 530, 92 S.Ct. 2182). We examine each factor in turn."
928 So.2d at 263.
A. Length of the delay. The victims were murdered in December 1999. Sharifi was arrested in California on December 28, 1999, indicted in March 2001, and tried in January 2005. The delay in this case was 61 months.
"In Doggett v. United States, the United States Supreme Court explained that the first factor  length of delay  `is actually a double enquiry.' 505 U.S. 647, 651, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). The first inquiry under this factor is whether the length of the delay is `"presumptively prejudicial."' 505 U.S. at 652, 112 S.Ct. 2686 (quoting Barker, 407 U.S. at 530-31, 92 S.Ct. 2182). A finding that the length of delay is presumptively prejudicial `triggers' an examination of the remaining three Barker factors. 505 U.S. at 652 n. 1, 112 S.Ct. 2686 ('[A]s the term is used in this threshold context, "presumptive prejudice" does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the Barker enquiry.'). See also Roberson v. State, 864 So.2d 379, 394 (Ala.Crim.App.2002).
"In Alabama, `[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant  whichever is earlier  to the date of the trial.' Roberson, 864 So.2d at 394. Cf. § 15-3-7, Ala.Code 1975 ('A prosecution may be commenced within the meaning of this chapter by finding an indictment, the issuing of a warrant or by binding over the offender.'); Rule 2.1, Ala.R.Crim.P. ('All criminal proceedings shall be commenced either by indictment or by complaint.')."
928 So.2d at 263-64.
The Alabama Supreme Court in Walker held that a 50-month delay between arrest and trial was presumptively prejudicial. See also State v. Van Wooten, 952 So.2d 1176 (Ala.Crim.App.2006) (29-month delay was presumptively prejudicial); State v. Stovall, 947 So.2d 1149 (Ala.Crim.App. 2006) (41-month delay was presumptively prejudicial); Vincent v. State, 607 So.2d 1290 (Ala.Crim.App.1992) (31-month delay was presumptively prejudicial). Cf. State v. Johnson, 900 So.2d 482 (Ala.Crim.App. 2004) (28-month delay was not presumptively prejudicial); Payne v. State, 683 So.2d 440 (Ala.Crim.App.1995) (25-month delay was not presumptively prejudicial).
Here, the 61-month delay was presumptively prejudicial; thus, we look to the remaining Barker factors.
B. Reasons for the delay. The following dates are helpful in analyzing this factor:

*923 December 28, 1999  Sharifi arrested.
March 2000  Sharifi's first attorney moved to withdraw.
April 2001  Defense counsel moved for outpatient evaluation on Sharifi's competency to stand trial and his competency at the time of the murders.
May 2001  Defense counsel moved for funds to hire a psychiatrist and a psychologist.
August 2001  Defense counsel moved for expenses to travel to California to interview a potential defense witness.
September 2001  Defense counsel moved for travel expenses to Iran.
August 2001  Defense counsel moved for jury determination on defendant's mental competency. This motion was later withdrawn.
September 2001  Defense counsel filed supplemental motions to travel to California and Iran.
October 2001  State moved for a continuance of a motion hearing. Defense counsel objected to continuance.
October 2001  Defense counsel moved that Sharifi be transferred to Taylor Hardin Secure Medical Facility because the prior mental evaluation had stated that there was a question as to whether Sharifi could assist in his defense.
October 2001  Circuit court ordered that Sharifi be committed to Taylor Hardin Secure Medical Facility for further evaluation. Defense counsel moved to travel to Washington, D.C., to meet with the Iranian Interests Section of the Pakistan Embassy.
December 2001  Defense counsel filed second motion to travel to Washington, D.C.
January 2002  Copy of report of Sharifi's mental evaluation distributed to parties.
February 2002  Defense counsel moved for jury determination on Sharifi's mental competency and to allow the Iranian consulate officials to meet with Sharifi.
July 2002  Defense counsel moved that expert be given access to Sharifi in jail.
February 2003  Defense counsel moved to dismiss the charges based on violation of the Vienna Convention.
April 2003  State moved to continue May 2003 trial date based on motions filed by the defendant and trial was rescheduled to September 2004.
August 2003  Defense counsel moved to dismiss the charges based on State's violation of discovery orders and denial of his right to a speedy trial.
October 2003  Defense counsel moved for expert assistance to evaluate the DNA evidence. Defense counsel also objected to court-appointed interpreter and requested that new interpreter be appointed.
January 2004  Defense counsel moved to withdraw because Sharifi had filed complaint with the Alabama State Bar and because their relationship had deteriorated.
February 2004  Defense counsel moved to dismiss the charges based on lack of a speedy trial. Defense counsel also filed second motion to withdraw as counsel.
March 2004  Defense counsel filed third motion to withdraw.
March 2004  New counsel appointed.
April 2004  New counsel moved to withdraw based on conflict.
September 2004  Defense counsel moved for another mental evaluation and moved for a continuance.
October 2004  Court ordered another evaluation but based on State's objection the order was set aside.

*924 October 2004  State moved to continue so that defense could evaluate ballistic evidence.
January 24, 2005  Trial commenced.
The record also shows that numerous other motions were filed by defense counsel.[3] By far the vast majority of the delays were based on the numerous and lengthy motions filed by the defense. "`Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.' Walker v. State, 386 So.2d 762 (Ala.Cr. App.), writ denied, 386 So.2d 765 (Ala. 1980)." McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981).
C. Assertion of right to speedy trial. Attached to one of defense counsel's motions filed in August 2003 is a copy of a letter to the circuit court purportedly handwritten by Sharifi. The letter is dated September 27, 2000, and requests that Sharifi be given a speedy trial.
The record does show that in October 2001, defense counsel filed a motion objecting to the case being moved to the circuit court's administrative docket.[4] In this motion defense counsel argued: "Transferring this case to the administrative docket makes further delay likely and violates the defendant's constitutional rights to a speedy trial." (R. 256.) After this motion was filed, several motions for a speedy trial were filed. Sharifi has asserted his right to a speedy trial.
D. Prejudice to defendant. Sharifi argues on appeal that he was prejudiced by the 61-month delay for four reasons: (1) the delay caused a rift between him and his initial counsel; (2) the delay caused Iran to not cooperate with his attorneys; (3) the delay caused his mind to deteriorate; and (4) the delay caused his mother to overstay her visa and be forced to return to Iran, which resulted in the lack of mitigation evidence.
However, none of Sharifi's assertions are supported by the record. The record shows that Sharifi's counsel moved to withdraw because Sharifi had filed a complaint against them with the Alabama State Bar. Second, the United States has had no diplomatic relations with Iran since 1980, and the delay in trying Sharifi clearly was not the reason for the lack of cooperation on the part of the Iranian government. Third, the mental evaluations conducted on Sharifi showed that Sharifi was malingering and feigning his symptoms. Fourth, Sharifi's father was available and testified at Sharifi's trial.
Sharifi further asserts in his brief that the 61-month delay was not justified because, he says, "this was a very simple murder case." We cannot agree with Sharifi's characterization. This was a complex multiple homicide case in which Sharifi faced the ultimate punishment  death. The record shows that the circuit court took every precaution to ensure that Sharifi was granted a fair trial. It is clear that the majority of the delays were due to the court's desire to make every resource available to Sharifi before he faced trial on the capital charge. After evaluating the Barker v. Wingo factors, we cannot say that Sharifi was denied his constitutional right to a speedy trial.

V.
Sharifi next argues that the circuit court erred in denying his strikes for cause *925 of two prospective jurors, B.H. and S.C.,[5] who stated that they would believe the testimony of a police officer over the testimony of a lay witness.[6]
The record shows that defense counsel used two of its peremptory strikes to remove the challenged jurors. As we stated in Calhoun v. State, 932 So.2d 923 (Ala. Crim.App.2005):
"The Alabama Supreme Court in Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002), returned to the harmless-error analysis when reviewing a circuit court's refusal to remove a prospective juror for cause. The Supreme Court stated:
"`The application of a "harmless-error" analysis to a trial court's refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
"`"The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges."
"`Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that "[t]he denial or impairment of the right is reversible error without a showing of prejudice." (Emphasis added [in Bethea].) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala.1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State, 536 So.2d 127, 129 (Ala. Crim.App.1988) (quoting Uptain).
"`... [T]his Court has returned to the "harmless-error" analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an "impartial" jury, see Ala. Const.1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
"`In this instance, even if the Betheas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not *926 proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis.'
"833 So.2d at 6-7 (footnotes omitted). See also Dailey v. State, 828 So.2d 340 (Ala.2001). As was the case in Bethea, Calhoun offers no evidence that the jury ultimately impaneled was biased; therefore, if error occurred it was harmless."
932 So.2d at 944-45 (footnote omitted). Compare General Motors Corp. v. Jernigan, 883 So.2d 646 (Ala.2003) (harmless-error analysis does not apply when the circuit court erroneously denied five challenges for cause).
When denying Sharifi's challenge for cause of prospective juror S.C. the following occurred:
"[Defense counsel]: Your Honor, the defendant would move to strike juror [S.C.] for cause. She has stated that she would give more weight and credibility to the testimony of a police officer than another witness by comparison. She's also stated that she doesn't feel the death penalty is given frequently enough, and all those other reasons, the defense would move to strike her for cause.
"[Prosecutor]: Judge, we oppose that motion. She was very candid in her bent towards the system. But at no point did she say that she could not give a fair hearing to whoever it was. She may have a bias in there but she seemed to indicate to me  or to the Court that at every aspect she could give a fair hearing.
". . . .
"The Court: I'm going to deny your challenge. I think she could give a fair hearing and she was  she did give very thoughtful answers on her questionnaire. I had written down also that she said she would believe police over other witnesses, but when she explained it I think she has a fair understanding and would be fair."
(R. 876-77.) This juror stated in her juror questionnaire that whether she would believe the testimony of a police officer over the testimony of a lay witness would depend on the officer and the lay witness.
During the voir dire examination of juror B.H. the following occurred:
"[Prosecutor]: [B.H.], all I would ask you is whether  and I appreciate your views on things as evidenced in the questionnaire and here in open court. But would you be able to listen to a police [officer] and in your mind determine whether or not you believe that particular officer is telling the truth?
"[B.H.]: Yes. What I meant more in my answer was in an emergency type situation where someone is trained to respond that he would give a better description of an incident that I would believe him. So the question was somewhat misunderstood from what I answered.
"[Prosecutor]: Sure. But as far as in court testimony, listening to witnesses, is there any reasons why you can't give a fair hearing to that police officer and either believe him or not believe him as you choose?
"[B.H.]: I don't have a reason."
(R. 901-02.) These jurors were rehabilitated. "[J]urors who give responses that would support a challenge for cause may be rehabilitated by subsequent questioning by the prosecutor or the court." Johnson v. State, 820 So.2d 842, 855 (Ala.Crim.App. 2000). The circuit court committed no error in denying Sharifi's motions to remove these jurors for cause.

*927 VI.
Sharifi next argues that the State violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), by using its peremptory strikes to remove blacks and female prospective jurors from the venire. The United States Supreme Court in Batson first held that it was a violation of the Equal Protection Clause to remove black prospective jurors based solely on their race. This holding was extended to gender-based strikes in J.E.B.
After the State and defense exercised their peremptory strikes, the circuit court inquired as to whether either party had anything to say before Sharifi's jury was empaneled. Defense counsel responded that it did not. Accordingly, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
"To find plain error in the context of a Batson or J.E.B. violation, the record must supply an inference that the prosecutor was `engaged in the practice of purposeful discrimination.' Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987)." Blackmon v. State, [Ms. CR-01-2126, August 25, 2006] ___ So.2d ___, ___ (Ala. Crim.App.2005) (opinion on application for rehearing).
"In addressing a similar issue in Ex parte Trawick, 698 So.2d 162 (Ala.1997), the Alabama Supreme Court stated, in pertinent part:
"`Trawick first argues that the State used its peremptory challenges to discriminate against female jurors, in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and that the trial court erred by not requiring the State to articulate its reasons for its strikes of females. He points out that the State used 11 of its 14 peremptory strikes to remove women from Trawick's jury, resulting in a petit jury that was composed of 7 men and 5 women....
"`... A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.

*928 "`At trial, Trawick objected to the State's peremptory strikes, but objected solely on the basis of race, not gender. Trawick has offered no evidence that the female veniremembers shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent to discriminate against female jurors, that there was a lack of meaningful voir dire directed at the female jurors, or that female jurors and male jurors were treated differently. He has offered no evidence that the prosecutor had a history of using peremptory challenges in a manner that discriminated against veniremembers of either gender. Instead, Trawick has merely emphasized that the State used many of its strikes to remove women from the venire. Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination."
"698 So.2d at 167-68. See also Ex parte Pressley, 770 So.2d 143 (Ala.2000)."
Gavin v. State, 891 So.2d 907, 948-49 (Ala. Crim.App.2003).
Here, Sharifi has not identified any specific jurors who were improperly struck. Indeed, this section of his brief identifies no juror by name or juror number. Sharifi's argument consists of stating that the number of strikes used by the State and the fact that Madison County has a history of violating Batson is sufficient to remand this case for a Batson hearing.
We have thoroughly reviewed the voir dire examination and the juror questionnaires, and we find no inference that the prosecutor was engaged in purposeful discrimination toward black or female prospective jurors. Accordingly, we find no plain error.

VII.
Sharifi next argues that the circuit court erred in admitting the autopsy report completed by the coroner who conducted the autopsy on Sarah Sharifi without the testimony of its preparer. He asserts that the admission of the report violated his right to confrontation and the United States Supreme Court's decision in Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
We addressed this issue in Perkins v. State, 897 So.2d 457 (Ala.Crim.App.2004), in which we stated:
"During trial, the State advised the circuit court that it would present Dr. Embry's assistant, forensic technician Gerald Howard, to testify regarding the victim's autopsy because Dr. Embry was not available for trial. The State advised the court that Dr. Embry had retired and at the time of trial was out of the State on vacation. Howard had assisted Dr. Embry during the autopsy. Thereafter, over defense counsel's objection, Howard testified regarding the victim's wounds. During his testimony, Howard referred to the photographs taken during the autopsy, as well as to Dr. Embry's report. Howard stated that based on the report Dr. Embry had concluded that three of the four gunshot wounds suffered by the victim would have been fatal. Howard further stated that he concurred with Dr. Embry's findings, and that those findings were consistent with what he had observed during the autopsy. Dr. Johnny Randall Glenn, a medical examiner employed by the Department of Forensic Sciences, testified that Dr. Embry's report was an established business record kept in the ordinary course of business *929 by the Department of Forensic Sciences. Based on his review of the autopsy report and photographs, Dr. Glenn testified that in his opinion the cause of the victim's death was multiple gunshot wounds.
"The Confrontation Clause, contained in the Sixth Amendment to the United States Constitution provides: `In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court established a two-part analysis for determining whether certain testimony violates the Confrontation Clause; this analysis focuses on the necessity and reliability of the testimony. This Court discussed that standard in Grantham v. State, 580 So.2d 53 (Ala.Crim.App.1991):
"`"In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court `announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony.' United States v. Perez, 658 F.2d 654 at 660 (9th Cir.1981) (citing Roberts, 448 U.S. at 65-66, 100 S.Ct. at 2538-39). The first consideration is the `rule of necessity' established by the sixth amendment. Roberts, 448 U.S. at 65, 100 S.Ct. at 2538. `In the usual case ... the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.' Id. This necessity requirement is not `absolute.' Perez, 658 F.2d at 661. The government is not required to produce a seemingly available witness when the `utility of trial confrontation [is] remote.' Roberts, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Furthermore, `[t]estimony that is neither "crucial" to the prosecution nor "devastating" to the defendant might not be subject to the necessity requirement.' Perez, 658 F.2d at 661 (citing Dutton v. Evans, 400 U.S. 74 at 87, 89, 91 S.Ct. 210 at 219, 220, 27 L.Ed.2d 213 (1970)). If the government establishes the unavailability of the witness, Roberts then requires that the declarant's statement bear adequate `indicia of reliability.' Roberts, 448 U.S. at 66, 100 S.Ct. at 2539."'
"580 So.2d at 55-56 (quoting United States v. McClintock, 748 F.2d 1278, 1291-92 (9th Cir.1984), cert. denied, 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985)). After the decision in Grantham, the United States Supreme Court further refined its holding in Ohio v. Roberts, appearing to reject the "unavailability" prong of the Ohio v. Roberts test. See United States v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), and White v. Illinois, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). Despite these holdings, however, Alabama courts continued to apply the two-part analysis used in Ohio v. Roberts when reviewing Confrontation Clause issues. See, e.g., Ex parte Scroggins, 727 So.2d 131 (Ala.1998); Withee v. State, 728 So.2d 684 (Ala.Crim. App.1998); Barnes v. State, 704 So.2d 487 (Ala.Crim.App.1997).
"Recently, however, the United States Supreme Court revisited its holding in Ohio v. Roberts. In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the admission of a wife's out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the *930 Confrontation Clause. The Supreme Court stated that an out-of-court statement by a witness that is testimonial is barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statement is deemed reliable by the trial court, abrogating its previous holding in Ohio v. Roberts. While the Supreme Court applied a stricter standard to the admission of testimonial hearsay, however, it did not do so with regard to nontestimonial hearsay, noting:
"`Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law  as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.'
"541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.
"Unlike the hearsay in Crawford v. Washington, the hearsay at issue in this case is nontestimonial in nature  an autopsy report on the victim, Wysteria Mathews. As the Court noted in White: `[w]here [the] proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied.' 502 U.S. at 356, 112 S.Ct. [736].
"Both Alabama and federal caselaw have recognized that the business records exception is a firmly rooted exception to the hearsay rule. See, e.g., McNabb v. State, 887 So.2d 929, 969 (Ala.Crim.App.2001); Ohio v. Roberts, 448 U.S. at 66 n. 8, 100 S.Ct. 2531. Moreover, under Alabama law, `An autopsy report made in the regular course of business is admissible under the business records exception.' 2 Charles W. Gamble, McElroy's Alabama Evidence § 254.01(18) (5th ed.1996) (footnote omitted). See also Adams v. State, 955 So.2d 1037, 1072-73 (Ala.Crim.App. 2003); Baker v. State, 473 So.2d 1127, 1129 (Ala.Crim.App.1984). The results of Dr. Embry's autopsy and the supporting materials are business records, which bear the earmark of reliability or probability of trustworthiness and further the "`integrity of the fact-finding process,'" see Coy v. Iowa, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)); because this evidence satisfies the core value of the Confrontation Clause, the State did not have to establish Dr. Embry's unavailability.
"As seen from the evidence set out above, there was no question that the cause of the victim's death was a gunshot wound. Nor, given the eyewitness testimony, was there any question that Perkins was the person who shot the victim. Indeed, Perkins's defense was that he was not guilty by reason of mental disease or defect, based on his mental retardation. Perkins has submitted nothing to suggest that had he had the opportunity to cross-examine Dr. Embry, Dr. Embry would have changed his opinion as to the cause of Wysteria's death. We fail to see how Dr. Embry's presence would have added to the `fact-finding process.' Nor do we believe that the autopsy report as presented through the testimony of Howard and Glenn was a factor in the jury's rejection of Perkins's mental-defect defense."
897 So.2d at 463-65. See also Pruitt v. State, 954 So.2d 611 (Ala.Crim.App.2006) (relying on Perkins, we held that admission *931 of certificate of analysis did not violate Crawford).
Other courts have agreed that an autopsy report is a business record and nontestimonial in nature and that its admission does not offend Crawford. The United States Court of Appeals for the Second Circuit in United States v. Feliz, 467 F.3d 227, 236 (2d Cir.2006), noted the reasoning for this holding:
"[W]e return to the decision in Crawford and note that the Supreme Court expressly declined to adopt a specific formulation of when a statement is `testimonial.' 541 U.S. at 68, 124 S.Ct. 1354. Given that the Supreme Court did not opt for an expansive definition that depended on a declarant's expectations, we are hesitant to do so here. In addition, we point out that the characterization of business records as nontestimonial only accords with the need to preserve the efficiency and integrity of the truth-seeking process. Chief Justice Rehnquist praised what he considered to be Crawford's per se exclusion of business records from the definition of testimonial. He wrote, `the Court's analysis of "testimony" excludes at least some hearsay exceptions, such as business records and official records. To hold otherwise would require numerous additional witnesses without any apparent gain in the truth-seeking process.' Crawford, 541 U.S. at 76, 124 S.Ct. 1354 (Rehnquist, C.J., concurring). Another court recognized the practical difficulties we avoid in considering autopsy reports nontestimonial:
"`Years may pass between the performance of the autopsy and the apprehension of the perpetrator. This passage of time can easily lead to the unavailability of the examiner who prepared the report. Moreover, medical examiners who regularly perform hundreds of autopsies are unlikely to have any independent recollection of the autopsy at issue in a particular case and in testifying invariably rely entirely on the autopsy report. Unlike other forensic tests, an autopsy cannot be replicated by another pathologist. Certainly it would be against society's interests to permit the unavailability of the medical examiner who prepared the report to preclude the prosecution of a homicide case.'
"[People v.] Durio, [7 Misc.3d 729,] 794 N.Y.S.2d 863] at 869 [2005)] (holding that autopsy reports are not testimonial by virtue of their status as business records). In sum, therefore, we hold that where a statement is properly determined to be a business record as defined by Fed.R.Evid. 803(6), it is not testimonial within the meaning of Crawford, even where the declarant is aware that it may be available for later use at trial."
467 F.3d at 236. See also State v. Anderson, 942 So.2d 625, 628-29 (La.App. 2006) ("The information in the autopsy report was routine, descriptive, and nonanalytical; i.e., it was nontestimonial in nature and thus did not trigger the Crawford mandate for cross-examination pursuant to the Confrontation Clause."); State v. Craig, 110 Ohio St.3d 306, 322, 853 N.E.2d 621, 639 (2006) ("We agree with the majority view under Crawford and conclude that autopsy records are admissible as nontestimonial business records."); Rollins v. State, 392 Md. 455, 478, 897 A.2d 821, 834 (2006) ("[F]actual, routine, descriptive, and nonanalytical findings made in an autopsy report are [nontestimonial] and may be admitted without the testimony of the medical examiner.").
Here, the forensic pathologist who conducted the autopsy on Sarah's body, Dr. *932 John Glenn, was unable to testify because of his "psychological condition." The autopsy report was introduced into evidence by the State as a business record during the testimony of forensic pathologist Adam Craig. Craig testified that it was standard operating procedure for a coroner conducting an autopsy to file a report. Gerald Howard, a forensic pathology technician, assisted Dr. Glenn during Sarah's autopsy. He testified that he made photographs of Sarah's body and that he collected the bullets Dr. Glenn removed from her head. Also, Brown's manner of death, a gunshot to the head, was consistent with Sarah's manner of death. The coroner who conducted the autopsy on Brown, Joseph Embry, testified that Brown died as a result of a gunshot wound to his head. In closing argument, defense counsel argued:
"[The State does not] have to prove that it was Sarah Kay Smith Sharifi and Derrick Brown that are dead, that's obvious. We don't contest that. We contest that this defendant caused it. And we're not going to contest a great deal... [w]e don't really contest the fact that they were intentionally killed."
(R. 1650.) Sharifi presented an alibi defensehe never contested the cause of death for either victim. According to Alabama caselaw, the autopsy report was properly admitted into evidence under the business-record exception to the hearsay rule.
Moreover, even if there was error in admitting the autopsy report, that error was harmless beyond a reasonable doubt. See Perkins, 897 So.2d at 465.

VIII.
Sharifi next argues that Alabama's law on diminished capacity is unconstitutional because, he says, it does not allow evidence of "Sharifi's psychological maladies" to be used to negate intent. He asserts that the United States Supreme Court has just granted certiorari on this issue to review Arizona's law, which is similar to Alabama's.
This issue was never presented to the circuit court. Moreover, in Sharifi's brief he makes no reference to his own case. He merely makes a general argument that Alabama's law, § 13A-3-1, Ala.Code 1975, is unconstitutional. Thus, we review this claim for plain error. See Rule 45A, Ala. R.App.P.
In Jones v. State, 946 So.2d 903 (Ala. Crim.App.2006), we stated:
"We addressed and rejected a similar argument in Williams v. State, 710 So.2d 1276, 1309 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), explaining as follows:
"`The appellant contends that the express repudiation of the diminished capacity defense in § 13A-3-1 denies him due process and renders the statute unconstitutional.... After defining mental disease and defect and making it an affirmative defense, § 13A-3-1 provides that "[m]ental disease or defect does not otherwise constitute a defense." ...
"`The doctrine of diminished capacity provides that evidence of an abnormal mental condition not amounting to legal insanity but tending to prove that the defendant could not or did not entertain the specific intent or state of mind essential to the offense should be considered in determining whether the offense charged or one of a lesser degree was committed. 22 C.J.S., Criminal Law § 97 (1989). See also W. LaFave and A. Scott, Substantive Criminal Laws, § 4.7 (1986) (noting that the doctrine of diminished capacity is recognized in some jurisdictions). Alabama has expressly rejected *933 this doctrine. Barnett v. State, 540 So.2d 810 (Ala.Cr.App.1988); Hill v. State, 507 So.2d 554 (Ala.Cr.App. 1986), cert. denied, 507 So.2d 558 (Ala. 1987); Neelley v. State, 494 So.2d 669 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987). A state is not constitutionally compelled to recognize the diminished capacity doctrine. Campbell v. Wainwright, 738 F.2d 1573 (11th Cir.1984); Muench v. Israel, 715 F.2d 1124 (7th Cir.1983), cert. denied, Worthing v. Israel, 467 U.S. 1228, 104 S.Ct. 2682, 81 L.Ed.2d 878 (1984); Chestnut v. State, 538 So.2d 820 (Fla.1989). The express repudiation of the diminished capacity doctrine [in] § 13A-3-1 does not render that statute unconstitutional. We find no merit to the appellant's contention, and certainly do not find plain error.'"
946 So.2d at 927.
Moreover, the United States Supreme Court in Clark v. Arizona, 548 U.S. 735, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006), held that Arizona's narrowing of the definition of insanity to exclude evidence of insanity when that evidence is used to negate intent was not unconstitutional. The Supreme Court stated:
"[T]he insanity rule, like the conceptualization of criminal offenses, is substantially open to state choice. Indeed, the legitimacy of such choice is the more obvious when one considers the interplay of legal concepts of mental illness or deficiency required for an insanity defense, with the medical concepts of mental abnormality that influence the expert opinion testimony by psychologists and psychiatrists commonly introduced to support or contest insanity claims. For medical definitions devised to justify treatment, like legal ones devised to excuse from conventional criminal responsibility, are subject to flux and disagreement. See infra, at 2732-2733; Cf. Leland [v. State of Oregon], 343 U.S. [790], at 800-801, 72 S.Ct. 1002 [(1952)] (no due process violation for adopting the M'Naghten['s Case, 8 Eng. Rep. 718 (H.L. 1843)] standard rather than the irresistible-impulse test because scientific knowledge does not require otherwise and choice of test is a matter of policy). There being such fodder for reasonable debate about what the cognate legal and medical tests should be, due process imposes no single canonical formulation of legal insanity."
126 S.Ct. at 2722. Accordingly, Sharifi is due no relief on this claim.

IX.
Sharifi next argues that the State's burden of proof in a capital case should be "beyond all doubt" and not beyond a reasonable doubt. He asserts that this standard has been proposed by the drafters of the Model Penal Code and numerous judges in their special writings.
This claim was never raised in the circuit court; therefore, we review this issue for plain error. See Rule 45A, Ala. R.App.P.
We recently addressed this issue in Lewis v. State, [Ms. CR-03-0480, November 2, 2007] ___ So.2d ___, ___ (Ala. Crim.App.2006) (opinion on return to remand), and stated:
"In Alabama, `the standard of proof in criminal cases is beyond a reasonable doubt.' Jackson v. State, 640 So.2d 1025, 1032 (Ala.Crim.App. 1992). As this Court noted in White v. State, 546 So.2d 1014 (Ala.Crim.App. 1989):
"`"The state [is] not required to remove by proof the possibility that defendant was innocent, but only to establish his guilt beyond a reasonable *934 doubt." Rice v. State, 204 Ala. 104, 106, 85 So. 437 (1920); Payne v. State, 424 So.2d 722, 725 (Ala.Cr.App.1982). "[I]f there was a probability of defendant's innocence, the defendant should be found not guilty. A probability of defendant's innocence is the equivalent of a reasonable doubt of guilt, which requires his acquittal.... The law does not require full proof of guilt,  another expression for clear or positive proof, beyond any doubt, but only such proof as produces satisfaction beyond reasonable doubt." Bones v. State, 117 Ala. 138, 23 So. 138, 139 (1898). "A defendant's guilt need not be proved `clearly, fully, and conclusively,' and, [instructions] thus framed, ... exact too high a degree of proof." McClain v. State, 182 Ala. 67, 62 So. 241, 245 (1913). "In criminal prosecutions, circumstantial evidence should be such as to exclude a rational probability of innocence to justify conviction." Chisolm v. State, 45 Ala. 66, 70 (1871). The evidence need not exclude hypotheses "rendered exceedingly remote and improbable, and morally, though not absolutely, impossible...." Id. "[T]he true test of the sufficiency of circumstantial evidence to justify a conviction is whether the circumstances as proved produce a moral conviction to the exclusion of every reasonable doubt. It is not necessary for the circumstances to be 'such as are absolutely incompatible, upon any reasonable hypothesis, with the innocence of the accused.'" Mitchell v. State, 114 Ala. 1, 22 So. 71, 72 (1897). "The law does not require the exclusion of every hypothesis of innocence, but only every reasonable hypothesis." Walker v. State, 134 Ala. 86, 32 So. 703, 704 (1902). "It is not the law, that the evidence must exclude every other hypothesis than that of defendant's guilt, or than the existence of the facts essential to conviction. The rule goes no further than to the exclusion of other reasonable  not speculative, imaginary, possible, hypotheses." Little v. State, 89 Ala. 99, 103, 8 So. 82, 83 (1890). "It is not any doubt arising out of the evidence which authorizes a jury to acquit one on trial for [a] crime, but only a reasonable doubt of such guilt generated by the evidence in the cause,  not a possible, speculative, or imaginary doubt." Perry v. State, 87 Ala. 30, 6 So. 425, 427 (1889).
"'"Human testimony is rarely so clear and full, as to exclude conjectured, divergent possibilities. Neither does mathematical certainty, or physical impossibility, define the rule. Conviction, resting on human testimony, can never attain the certainty of mathematical demonstration, or repel all possible doubt of its correctness. A rule so exacting would paralyze the punitive arm of the law. `A doubt which requires an acquittal, must be actual and substantial, not mere possibility or speculation. It is not a mere possible doubt, because every thing relating to human affairs, and depending upon moral evidence, is open to some possible or imaginary doubt.'" Coleman v. State, 59 Ala. 52, 54 (1877).
"`See also Mose v. State, 36 Ala. 211, 231 (1860). "The jury need never find that the defendant cannot be innocent.... There might be a possibility of defendant's innocence, and yet from the whole evidence, no reasonable doubt of his guilt." Morris v. State, 124 Ala. 44, 27 So. 336, 337 (1900).
"`A mere conflict in the evidence does not authorize an acquittal. *935 Monk v. State, 258 Ala. 603, 605, 64 So.2d 588 (1953). A conviction is warranted though the evidence is susceptible of being interpreted that another committed the crime, where such interpretation is not of sufficient force to raise a reasonable doubt of accused's guilt. Brown v. State, 121 Ala. 9, 25 So. 744, 745 (1899).'
"546 So.2d at 1021-22.
"The federal courts likewise apply the beyond-a-reasonable-doubt standard set out in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), when assessing the sufficiency of the evidence, whether direct or circumstantial, to support a criminal conviction. The `relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' 443 U.S. at 319. As the Supreme Court went on to explain, the beyond-a-reasonable-doubt standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' 443 U.S. at 319, 99 S.Ct. 2781.
"It is clear that the proof beyond a reasonable doubt standard is based on well-established Alabama and federal caselaw. We see no reason to depart from such long-standing precedent."
___ So.2d at ___. For the reasons that we stated in Lewis, we also see no reason to change long-established precedent.

X.
Sharifi next makes several different arguments concerning the circuit court's jury instructions in the guilt phase of his trial.

A.
Sharifi first argues that the court erred in failing to instruct the jury on the lesser-included offenses of intentional murder, reckless murder, felony murder, and manslaughter. He asserts: "It does not matter whether a capital murder defendant wants lesser-included offenses or not. It is the trial court's duty as a gatekeeper to ensure by instructing the jury on lesser-included offenses that only the most deserving of execution are put to death." (Sharifi's brief at page 131.) He further asserts that it violated the United States Supreme Court's decision in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), for the court not to charge the jury on any lesser-included offenses.
The record shows that the following occurred before the jury instructions were given in the guilt phase:
"[Defense counsel]: Your Honor, we would cite Holladay v. State, [549 So.2d 122 (Ala.Crim.App.1988),] Court of Criminal Appeals case decided September 20, 1988. It was a case wherein the defendant was charged with homicide made capital because the same allegations in that indictment as this one, that two individuals were intentionally killed.
"Now in that case the defendant made a motion for a lesser  a charge to the jury on a lesser included offense of intentional murder. And if I can cite from that case in the headnotes I could go and read the more extensive things, it says the defendant, who was charged with murder wherein two or more persons are murdered as a result of one act by the defendant or a single course of conduct was not entitled to an instruction on intentional murder as a lesser included offense where at least two of the three victims were killed by the same gun and the defense was alibi and *936 there was no evidence that the defendant only killed one of the victims and not the other two.
"Your Honor, the allegation is that the defendant killed both of these victims, that is the State's case. There is no evidence that he killed one and not the other. And to the contrary the State's going to argue that the weapon found in his possession fired the two fatal rounds. We're going to argue to the contrary. But they are asserting that he is guilty of both offenses, not one. There's no evidence in this case that he only did one and not the other. If the jury believes the State's case and their arguments, there's no set of circumstances under the facts that he killed one and not the other. And we are bound by his admonition and his directions and we have tried to stay true to that the whole... throughout the whole trial wherein he has pleaded not guilty. There is no allegation of self-defense, there is no allegation of mental disease or defect, or no defense of those things. And as in the Holladay case the defense is alibi.
"So this case is on all fours with ours. We don't feel that any lesser included offense of intentional murder is justified. And I would submit under the evidence in the case if the jury believes the State's theory of the case, there is not going to be any evidence of felony murder, not going to be any evidence of a reckless homicide, certainly there's no evidence of heat of passion, which would reduce it to  either one of the homicides to manslaughter, therefore we believe that he goes to the jury on capital murder."
(R. 1605-07.) The circuit court then indicated that it would give a charge on the lesser-included offense of intentional murder unless the Holladay case dictated otherwise. After researching the case, the court declined to charge on any lesser-included offenses.
As clearly evidenced by the dialogue above, Sharifi invited any error by specifically requesting that the court not instruct the jury on any lesser included offenses.
"`Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.' Phillips v. State, 527 So.2d 154, 156 (Ala.1988). `The doctrine of invited error applies to death-penalty cases and operates to waive any error unless the error rises to the level of plain error.' Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003)."
Robitaille v. State, 971 So.2d 43, 59 (Ala. Crim.App.2005). In Gibson v. State, 555 So.2d 784 (Ala.Crim.App.1989), we stated:
"Appellant Hart also maintains that his manslaughter conviction is due to be reversed because manslaughter is not a lesser included offense of murder for pecuniary gain, the capital offense for which he was indicted. We note, however, that Appellant Hart requested that the trial court instruct the jury on manslaughter as a lesser included offense of capital murder.
"`Hence, even if the given charge was improper, we would not regard [appellant's] complaint as meritorious for he has no cause to complain. A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions. 24A C.J.S. Criminal Law § 1842 (1962). See also Brannon v. State, 12 Ala.App. 189, 67 So. 634, 635 (1914), cert. denied, 191 Ala. 29, 67 So. 1007 (1915); Livingston v. State, 7 Ala.App. 43, 61 *937 So. 54, 57 (1912) (on rehearing). As Presiding Judge Bowen noted in applying the invited error doctrine, "It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice." Murrell v. State, 377 So.2d 1102, 1105 (Ala.Crim.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 179 So.2d 51, 54 (1965). The doctrine of invited error has been specifically applied to possible error resulting from the defendant's request for a particular jury instruction. E.g., Jelks v. State, 411 So.2d 844, 848 (Ala. Crim.App.1981); Burke v. State, 18 Ala.App. 152, 89 So. 162, 164 (1921); People v. Clements, 316 Ill. 282, 147 N.E. 99 (1925); Partee v. State, 19 Ga.App. 752, 92 S.E. 306 (1917).'

"Leverett v. State, 462 So.2d 972, 976-77 (Ala.Cr.App. 1984). Because Hart requested the manslaughter instruction, he is estopped from complaining of any possible error which may have resulted therefrom."
555 So.2d at 797-98.
Moreover, this Court in Holladay v. State, 549 So.2d 122 (Ala.Crim.App. 1988), stated:
"A lesser-included offense instruction should only be refused in a death case when the evidence adduced at trial could only support a conviction on the crime charged in the indictment. Thus, the ultimate question before this court is whether there is a reasonable theory from the evidence in this case, which would support a charge on the lesser-included offense of intentional murder. We are of the opinion that there is not.
"The evidence which makes this crime a capital offense (the murder of two or more persons) is undisputed. At least two of the victims were killed by the same gun. The appellant's defense was alibi. There was absolutely no evidence presented by the defense or the State that appellant killed only one of the victims but not the other two victims. There was absolutely no evidence presented that someone accompanied the appellant to the trailer on the night in question.
"The crime of intentional murder is automatically elevated to capital murder when two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct. Therefore, if the evidence in this case showed that the appellant killed two or more of the victims (which it does), then the jury had to convict the appellant of capital murder.
"We conclude that there was no reasonable theory under the evidence presented at this trial which could have justified a conviction of this appellant for intentional murder. Thus, the trial judge properly refused the appellant's request for a charge on the lesser-included offense of intentional murder."
549 So.2d at 129-30.
Furthermore, there was no Beck violation in this case.
"Under Beck, a capital defendant cannot receive a death sentence when the trial court prohibits the jury from considering a verdict of guilt on a lesser included, non-capital offense, if the evidence supports such a verdict. Beck, 447 U.S. at 635, 100 S.Ct. at 2388-89. In Alabama, intentional murder, in some instances constitutes a lesser included offense of capital murder. Holladay v. State, 549 So.2d 122, 129 (Ala.Crim.App. 1988), aff'd, 549 So.2d 135 (Ala.1989). Section 13A-5-40(b) of the Alabama Code specifically provides that intentional murder under Section 13A-6-2(a)(1) `may be a lesser included offense' of *938 capital murder under Alabama Code § 13A-5-40(a). The rule in Beck, however, applies only in those instances where a reasonable view of the evidence supports a conviction for the lesser included offense. Leverett v. Spears, 877 F.2d 921, 924 (11th Cir.1989); Holladay, 549 So.2d at 129. See also Jones v. State, 514 So.2d 1060, 1063 (Ala.Crim. App.) (accused entitled to instruction on lesser included offenses where a reasonable theory from the evidence supports the position), cert. denied, 514 So.2d 1068 (Ala.1987)."
Walker v. Jones, 10 F.3d 1569, 1573 (11th Cir.1994).
In this case, Sharifi's defense was that he was in California at the time of the murders. Both victims were killed with the same murder weapon, both were shot in the head, and both were found in the same body of water. According to our holding in Holladay, there was no reasonable theory from the evidence that would support a conviction for any lesser included offenses. Thus, the circuit court did not err in declining to charge the jury on any lesser offenses to the offense of capital murder.

B.
Sharifi next argues that the circuit court erred in failing to include in its instruction on circumstantial evidence that the jury could not base "an inference on an inference."
The circuit court's jury instruction on circumstantial evidence stated, in part:
"Some of the evidence in this case, as is generally true in most cases, is circumstantial. Circumstantial evidence is positive proof of circumstances or facts which tend to prove the existence of the facts sought to be proved. It is inferences drawn from physical facts."
(R. 1737.) The court instructed the jury that inferences were to be drawn from "physical facts." "The instruction at issue 'did not permit the jury to make an inference based solely or entirely upon another inference,' since the trial court had `specifically instructed the jury that inferences could be made only from facts the jury found to have been established by direct evidence.'" State v. Group, 98 Ohio St.3d 248, 265, 781 N.E.2d 980, 998 (2002), quoting in part State v. Palmer, 80 Ohio St.3d 543, 560-62, 687 N.E.2d 685, 702 (1997). Accordingly, there was no error in the court's instructions on circumstantial evidence.

Penalty-Phase Issues

XI.
Sharifi next argues that the death penalty is unconstitutional because "there is a substantial risk that we are executing the innocent and executing the guilty, who deserve punishment, but not the death penalty." (Sharifi's brief at page 150.) He further asserts that there are geographic and racial disparities in the imposition of the death penalty and that the death penalty violates numerous constitutional provisions.
We recently addressed this issue in Lewis v. State, [Ms. 03-0480, November 2, 2007] ___ So.2d ___, ___ (Ala.Crim.App. 2006) (opinion on return to remand), and stated:
"Alabama's statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases in which Alabama appellate courts have rejected such challenges can be found in Travis v. State, 776 So.2d 819, 873 (Ala. Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). Further, Lewis makes no individualized *939 claim that, as it specifically applies to him, execution by lethal injection constitutes cruel and unusual punishment. As we stated in Bryant v. State, 951 So.2d 732, 747-48 (Ala.Crim.App.2003) (opinion on return to remand):
"`We note that Alabama's statutory death-penalty scheme has repeatedly been upheld against constitutional challenges. A comprehensive listing of the cases dealing with these challenges can be found in Travis v. State, 776 So.2d 819, 873 (Ala.Crim.App. 1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). Moreover, we know of no authority in support of the general proposition that death by lethal injection violates a defendant's constitutional rights. Indeed, a number of jurisdictions have rejected such claims. See, e.g., Sims v. State, 754 So.2d 657, 668 (Fla.2000); State v. Carter, 89 Ohio St.3d 593, 608, 734 N.E.2d 345 (2000); Ritchie v. State, 809 N.E.2d 258, 262 (Ind.2004); Wheeler v. Commonwealth, 121 S.W.3d 173, 186 (Ky.2003).3 Today, we join these jurisdictions in holding that death by lethal injection is not per se cruel and unusual punishment.
"`3 Indeed, the only case we know of successfully challenging execution by lethal injection involved an inmate's individualized claim that death by lethal injection would violate the Eighth Amendment's prohibition against cruel and unusual punishment because he suffered from collapsed veins. See Nelson v. Campbell, 541 U.S. 637 (2004). Bryant makes no such individualized claim. Thus, he is entitled to no relief on his claim that death by lethal injection constitutes cruel and unusual punishment.'
"See also Brown v. State, [Ms. CR-04-0293, June 29, 2007] ___ So.2d ___, ___ (Ala.Crim.App.2007); Belisle v. State, [Ms. CR-02-2124, March 2, 2007] ___ So.2d ___, ___ (Ala.Crim.App. 2007); Brooks v. State, 973 So.2d 380, 421 (Ala.Crim.App.2007). In addition to Alabama, other states have likewise rejected constitutional challenges to execution by lethal injection, finding this method is almost "`universally recognized as the most humane method of execution, and least apt to cause unnecessary pain.'" State v. Webb, 252 Conn. 128, 145, 750 A.2d 448, 457 (2000) (citing, in turn, Woolls v. McCotter, 798 F.2d 695, 698 (5th Cir), cert. denied, 478 U.S. 1031 (1986); Kelly v. Lynaugh, 862 F.2d 1126, 1135 (5th Cir.1988), cert. denied, 492 U.S. 925, 109 S.Ct. 3263, 106 L.Ed.2d 608 (1989); Hill v. Lockhart, 791 F.Supp. 1388, 1394 (E.D.Ark.1992); Felder v. Estelle, 588 F.Supp. 664, 674 (S.D.Tex.1984); State v. Hinchey, 181 Ariz. 307, 315, 890 P.2d 602 (1995); State v. Deputy, 644 A.2d 411, 421 (Del.Super.1994); People v. Stewart, 123 Ill.2d 368, 386, 123 Ill.Dec. 927, 528 N.E.2d 631 (1988), cert. denied, 489 U.S. 1072, 109 S.Ct. 1356, 103 L.Ed.2d 824 (1989); State v. Moen, 309 Or. 45, 98-99, 786 P.2d 111 (1990); Hopkinson v. State, 798 P.2d 1186, 1187 (Wyo.1990)). We note, however, that since this Court released its decision in Bryant, one California court has held that lethal injection `as actually administered in practice' violates the prohibition against cruel and unusual punishment. See Morales v. Tilton, 465 F.Supp.2d 972, 974 (N.D.Cal. 2006). Moreover, on September 25, 2007, the United States Supreme Court announced that it would consider whether execution by lethal injection violated the Eighth Amendment's prohibition against cruel and unusual punishment. See Baze v. Rees, ___ U.S. ___ (2007). Until the United States Supreme Court provides further guidance on this issue, we decline to revisit our holding in Bryant and its progeny, given the number *940 of other jurisdictions that have rejected the merits of a similar claim."
___ So.2d at ___. For the reasons stated above we similarly hold that until the United States Supreme Court provides us with further guidance we decline to revisit our holding on this issue.

XII.
Sharifi next argues that Alabama's death-penalty statute violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). In Ring, the United States Supreme Court applied its earlier holding in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to capital cases and held that "[c]apital defendants... are entitled to a jury determination on any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589, 122 S.Ct. 2428.
Sharifi specifically lists four different grounds in support of this argument:
"A. Alabama's capital sentencing scheme violates the 5th, 6th, 8th, and 14th amendments because the aggravating factor(s) and mitigating factors are found by a judge instead of a jury and the finding of whether the aggravating circumstance(s) outweighs the mitigating circumstance(s) are found by a judge instead of a jury.
"B. Alabama's capital sentencing scheme violates the 5th, 6th, 8th, and 14th amendments because it does not require a unanimous finding on whether the aggravating circumstance(s) exists beyond a reasonable doubt; it does not require the judge and the jury to make their findings of whether the aggravating circumstance(s) outweighs the mitigating circumstance(s) beyond a reasonable doubt; and it does not require a unanimous finding by the jury on whether the aggravating circumstance(s) outweighs the mitigating circumstance(s).
"C. Mohammad Sharifi's indictment failed to specify the aggravating circumstances in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and state law.
"D. The jury does not issue written findings so it is unknown what the jury does and does not find."
(Sharifi's brief at pages 155-56.)
The appellate courts of this State have consistently held that the United State Supreme Court's decisions in Apprendi and Ring did not invalidate Alabama's death-penalty statute which places the ultimate determination of the defendant's sentence in the hands of a trial judge and not a jury. See Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Lewis v. State, supra; Brownfield v. State, [Ms. CR-04-0743, April 27, 2007] ___ So.2d ___ (Ala.Crim.App.2007); Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002). We have also rejected arguments that the aggravating circumstances must be contained in an indictment. See Benjamin v. State, 940 So.2d 371 (Ala.Crim.App.2005); Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005); Walker v. State, 932 So.2d 140 (Ala.Crim. App.2004).
Moreover,
"Lewis further argues that Ring requires the jury to issue written findings regarding which aggravating circumstances it finds to exist.
"This Court has rejected similar claims in previous death-penalty decisions. See, e.g., Walker v. State, 932 So.2d 140, 147 (Ala.Crim.App.2004). The Alabama Supreme Court has likewise rejected this argument. The Supreme Court has held, in numerous *941 cases, that the jury's verdict finding a defendant guilty of capital murder during the guilt phase of his trial, indicated that the jury had unanimously found a proffered aggravating circumstance included within the § 13A-5-40(a), Ala. Code 1975, definition of the particular capital-murder offense charged in the indictment. See, e.g., Ex parte Hodges, 856 So.2d 936 (Ala.2003); Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Stallworth v. State, 868 So.2d 1128 (Ala.Crim. App.2001) (opinion on return to second remand), cert. denied, 868 So.2d 1189 (Ala.2003). But see Ex parte McGriff, 908 So.2d 1024, 1039 (Ala.2004) (authorizing prospective use of a penalty-phase special interrogatory). Moreover, in Ex parte McNabb, 887 So.2d 998 (Ala.2004), the Supreme Court held that even a nonunanimous recommendation of death by the jury proved that the jury, including the jurors who voted against the recommendation of death, had unanimously found the existence of a proffered aggravating circumstance, even though the circumstance was not included within the definition of the particular capital-murder offense charged in the indictment, because the trial court had specifically instructed the jury that it could not proceed to a vote on whether to impose the death penalty unless it had already unanimously agreed that the aggravating circumstance existed. Because the jury recommended by a vote of 10-2 that Lewis be sentenced to death, it is clear that it unanimously found the existence of at least one aggravating circumstance."
Lewis, ___ So.2d at ___. For these reasons, Sharifi is due no relief on these claims.

XIII.
Sharifi argues that his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated because his attorneys were unable to obtain and to present known mitigating evidence and were unable to rebut the State's evidence on mens rea. Specifically, he argues that he filed several motions seeking to prohibit the State from imposing the death penalty because, he argued, he was unable to obtain mitigating evidence. However, these motions were denied.
There is absolutely no indication in the record that Sharifi's due-process rights were violated. In fact, the opposite is true. The record shows that in April 2001, the circuit court ordered that Sharifi be evaluated by a mental-health professional. Based on the report generated as a result of this examination, in October 2001, the circuit court directed that Sharifi be committed to Taylor Hardin Secure Medical Facility for further evaluations. The circuit court also granted Sharifi's motion for an interpreter to be present at all court proceedings; granted Sharifi's motion for a mitigation expert and allowed expenses in the amount of $7,500 for that expert; granted Sharifi's motion for investigative expenses in the amount of $4,500; and granted Sharifi's two motions to depose witnesses in California and allowed expenses for those depositions in the amount of $2,500. The circuit court also allowed expenses in the amount of $50,000 for Sharifi's investigator to travel to Iran and to research Sharifi's background. The only motion the circuit court denied was the motion for defense counsel to depose Sharifi's mother in Iran. That motion was denied because the State filed an objection to the deposition and stated that it would have no means of appearing at the deposition and cross-examining the witness. Sharifi was allowed every available resource. However, because of the lack of diplomatic relations with Iran, Sharifi's investigator was unable to travel to Iran. *942 Sharifi's father was available and testified at the trial and at the sentencing hearing before the court.
It is clear from reading the record that neither the State nor the circuit court did anything to impede Sharifi's presentation of mitigation evidence. Indeed, a review of the record tends to support the conclusion that counsel made a strategic decision to not present some mitigation evidence at the sentencing hearing before the jury. It presented the testimony of one witness who said that he was unable to obtain mitigating evidence because he was unable to secure a travel visa to Iran. At closing arguments in the penalty phase, defense counsel stated that it was unfair to sentence Sharifi to death when his counsel had failed to obtain any mitigation evidence because they could not travel to Iran. At the sentencing hearing before the circuit court, Sharifi's father testified that it was unfair to sentence Sharifi to death because no mitigation evidence had been presented. Sharifi made this same statement to the court when he made a statement before his sentence was pronounced.
However, nothing in the record indicates that Sharifi was prevented from presenting any available mitigation evidence. For these reasons, Sharifi is due no relief on this claim.

XIV.
Sharifi next argues that the court's instructions in the penalty phase were erroneous for several different reasons.
"When reviewing a trial court's jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999). `The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant's failure to object does weigh[ ] against his claim of prejudice.' Ex parte Boyd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998)."
Johnson v. State, 820 So.2d 842, 874 (Ala. Crim.App.2000).
"A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, `"the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together."' Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App. 1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App. 1992)."
Williams v. State, 795 So.2d 753, 780 (Ala. Crim.App.1999).

A.
Sharifi argues that the court gave an erroneous instruction when it instructed the jury that the "defendant had to interject [mitigation] and prove it to a reasonable certainty." He cites Ex parte Broadnax, 825 So.2d 233 (Ala.2001), in support of his argument that this instruction was erroneous.
The circuit court gave the following instruction on mitigation evidence:
"With regard to mitigating circumstances there is a list of those also under our capital offense statute. And although they are of equal importance under our law for your consideration in arriving at a proper decision in this sentencing hearing, mitigation is not like aggravation in that the list of mitigating *943 circumstances is not a complete list. In addition to the list of the mitigating circumstances enumerated by a specific code section in the Code of Alabama, the code also provides that in addition to those enumerated mitigating circumstances that mitigating circumstances shall include any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole as opposed to death and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.
"In this regard, Ladies and Gentlemen, let me tell you that you may consider any and all of the testimony that you have heard and the evidence submitted in determining mitigating circumstances if you find any exist. The burden of proof on that is for the defendant to put that evidence before you and you may consider it. If you are reasonably satisfied that it exists or did exist at any time during the defendant's life before or after the commission of this crime, unless the State has proven by preponderance of the evidence that it did not exist.
". . . .
"The mitigating circumstances which you are to consider must be based on the evidence that you have heard and not on conjecture or surmise. You are not to speculate on mitigation any more than you could speculate on aggravating circumstances. But if you are reasonably satisfied from the evidence which has been presented during any phase of the trial that mitigation exists in this case and the State has not disproven such mitigation, then you may consider it. You need be only reasonably satisfied of the existence of mitigating circumstances. You do not have to be convinced beyond a reasonable doubt that a particular mitigating circumstance exists. On the other hand, aggravating circumstances must be proved to you beyond a reasonable doubt."
(R. 1850-52; emphasis added). The emphasized portion of the argument is a correct statement of the law. The defendant has no burden in regard to mitigation evidence. See § 13A-5-45(g), Ala.Code 1975. However, the court later erroneously instructed the jury that the defendant had to prove mitigation to the jury's reasonable satisfaction.
In Ex parte Broadnax, 825 So.2d 233 (Ala.2001), the jury was erroneously instructed that mitigating circumstances had to be established to the reasonable satisfaction of the jury. After concluding that the instruction was erroneous, the Alabama Supreme Court held that the error was harmless. The court stated:
"In Elledge v. Dugger, 823 F.2d 1439 (11th Cir.1987), the United States Court of Appeals for the Eleventh Circuit held that an erroneous jury instruction during the penalty phase in a death-penalty case does not mandate reversal if the jury is not directed to ignore nonstatutory mitigating evidence and if the judge, who is the sentencer, is aware that the evidence is to be properly considered. The Florida Supreme Court applied the Elledge holding in Delap v. Dugger, 513 So.2d 659 (Fla.1987), when it conducted a harmless-error analysis to determine whether an erroneous jury instruction on the consideration to give mitigating circumstances mandated reversal. In its analysis, the Florida court considered the following facts: That the defense had not been limited in presenting nonstatutory mitigating circumstances; that the jury had not been instructed that it *944 could not consider the nonstatutory mitigating evidence; that the judge had known that nonstatutory mitigating factors could be considered; and that the mitigating evidence was weak when balanced against the five aggravating factors. The Florida Supreme Court held that, based on the totality of the circumstances, the erroneous jury instruction had had no effect upon the jury's recommendation and the judge's sentence of death. After considering the totality of the circumstances, the court held that the erroneous instruction had no impact on the jury's advisory recommendation or on the judge's imposition of the death sentence.
"We agree with the Florida Supreme Court and the Court of Criminal Appeals that an erroneous instruction on the consideration to give mitigating evidence is subject to a harmless-error review. Cf. Lawhorn v. State, 581 So.2d 1159, 1176-77 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991).
"Here, three aggravating circumstances were established beyond a reasonable doubt as evidenced by the jury's verdicts from the guilt phase. A review of the record adequately supports the finding that the killings of Jan and DeAngelo were `especially heinous, atrocious, or cruel' when compared to other capital offenses, see § 13A-5-49(8), Ala. Code 1975. Thus, the state presented compelling evidence of the aggravating circumstances.
"Although the defense was not limited in presenting evidence of mitigating circumstances, the mitigating evidence was minimal. Broadnax argued that because the murders were committed shortly after he had been denied parole, he was `under the influence of extreme mental or emotional disturbance' when he committed the murders, see § 13A-5-51(2), Ala.Code 1975. He also presented testimony from his sister Dorothy McKinstry of nonstatutory mitigating circumstances.
"During the argument portion of the penalty phase, both the state and defense counsel argued that it was proper for the jury to consider the mitigating evidence that had been presented. The trial court stated in its order imposing the death sentence that, when it weighed the aggravating and mitigating circumstances, it considered `all of the matters that were presented ..., the testimony heard at trial and the sentencing hearing..., both in mitigation and by aggravation.'
"After carefully reviewing all the evidence presented during the penalty phase, we unhesitatingly conclude that even if the jury had been properly instructed on the consideration it should give the statutory and nonstatutory mitigating circumstances, the jury would have recommended a death sentence in this case. Moreover, the trial court's sentencing order indicates that it gave the mitigation evidence proper consideration. Considering the totality of the circumstances, we hold that the jury instruction, although erroneous, had no impact on the jury's recommendation or on the trial court's sentence of death."
825 So.2d at 236-37.
We find that the erroneous instruction in this case was harmless. During the penalty phase, defense counsel made the following argument:
"I stand here a complete and abject failure, completely ineffective in this, not because of lack of effort, not because we haven't spent hours on the phone with Faribox Jahansoozan. I've written letters to Mr. Aziz Jazeeni, who is the *945 director of that agency up there. I have met with, sent letters to, spoken on the phone with members of the Taher Kameli Law Firm, despite all of those things you don't have any mitigation evidence to weigh against the aggravating evidence.
". . . .
"And what would be unfair, if you're going to hold the policies, the diplomatic policies of the United States against this defendant, if you're going to hold the results of the policies, diplomatic policies of the United States against this defendant, if you're going to be unfair and give him the death penalty, that's your prerogative, it's unfair. It's unfair to anybody. I ask you not to do it."
(R. 1839-40.) In the guilt phase the jury found beyond a reasonable doubt that Sharifi murdered Sarah and Brown during one act or pursuant to one course of conduct  an aggravating circumstance set out in § 13A-5-49(9), Ala.Code 1975.[7] No mitigating evidence was presented to the jury during the sentencing hearing. However, the circuit court did find mitigation in its sentencing order. Thus, the court's erroneous instruction to the jury was harmless beyond a reasonable doubt. See Ex parte Broadnax.

B.
Sharifi next argues that the circuit court erred in failing to sua sponte instruct the jury on residual doubt. We note that Sharifi did not request an instruction on residual doubt, nor was any type of objection raised on this issue in the circuit court. Thus, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
In Melson v. State, 775 So.2d 857, 898-99 (Ala.Crim.App.1999), we stated:
"In Myers v. State, 699 So.2d 1281 (Ala.Cr.App.1996), aff'd, 699 So.2d 1285 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998), this court stated the following concerning jury instructions on `residual doubt':
"`"`Our cases do not support the proposition that a defendant who has been found to be guilty of a capital crime beyond a reasonable doubt has a constitutional right to reconsideration by the sentencing body of lingering doubts about his guilt. We have recognized that some states have adopted capital sentencing procedures that permit defendants in some cases to enjoy the benefit of doubts that linger from the guilt phase of the trial, see Lockhart v. McCree, 476 U.S. 162, 181, 106 S.Ct. 1758, 1768, 90 L.Ed.2d 137 (1986), but we have never indicated that the Eighth Amendment requires states to adopt such procedures. To the contrary, as the plurality points out, we have approved capital sentencing procedures that preclude consideration by the sentencing body of "residual doubts" about guilt. See Ante [Franklin v. Lynaugh], [487 U.S. at 173 n. 6, 108 S.Ct.] at 2327, n. 6 [(1988)].
"`"`Our decisions mandating jury consideration of mitigating circumstances provide no support for petitioner's claim because "residual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. [citations *946 omitted]. "Residual doubt" is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty."'"'
"699 So.2d at 1283-84, quoting Harris v. State, 632 So.2d 503, 535 (Ala.Cr.App. 1992), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (D.Ala.1995), quoting in turn Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).
"Thus, the trial court properly refused to instruct Melson's jury on `residual doubt' or `lingering doubt.'"
The circuit court committed no error in not instructing the jury on residual doubt.

C.
Sharifi next argues that the court erred in failing to instruct the jury that according to Alabama law there is a presumption that the mitigating circumstances outweigh the aggravating circumstances. Sharifi cites the case of People v. Tenneson, 788 P.2d 786 (Colo.1990), in support of this argument.
There was neither an objection to the instructions on that basis nor a request that the court instruct the jury that when determining the appropriate sentence there is a "presumption of life imprisonment." Therefore, we are limited to determining whether that omission constitutes plain error. See Rule 45A, Ala.R.App.P.
The Colorado Supreme Court in People v. Tenneson stated:
"Although we conclude that the trial courts did not err in referring to a presumption of life imprisonment in the challenged jury instructions, we believe that the better practice is to avoid the use of that term. The statute makes no reference to a presumption of life imprisonment. As employed in Vialpando and Tenneson,[8] the `presumption' was only another way of expressing the statutory requirements. Our holding that the trial courts acted within their discretion in giving the presumption of life imprisonment instructions, however, is based specifically on the language of those instructions, including the contexts in which the term `presumption of life imprisonment' appears. The use of this term has potential for confusing the jury by introducing an additional and unnecessary concept in an already complex set of instructions. For that reason we believe that the inclusion of the term `presumption of life imprisonment' in jury instructions at the sentencing stage of a death penalty case under the statutory scheme applicable here was ill-advised, although within the trial courts' discretion."
788 P.2d at 798-99.
In this case the court properly instructed the jury that it could not consider the death penalty until the jurors determined that an aggravating circumstance existed. The court committed no error in failing to instruct the jury that there was a presumption in favor of a sentence of life imprisonment.

XV.
Sharifi argues that the cumulative errors affected his substantial rights and warrant a new trial.
"The Alabama Supreme Court has set forth the cumulative-error rule as follows: `[W]hile, under the facts of a *947 particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have "probably injuriously affected substantial rights of the parties," then the cumulative effect of the errors may require reversal.' Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala.R.App.P.). Applying this standard to Lewis's allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of the individually nonreversible errors in this case affected Lewis's substantial rights at trial."
Lewis v. State, ___ So.2d at ___. We find that the cumulative effect of the individual nonreversible errors did not affect Sharifi's substantial rights.

XVI.
Though not specifically argued in Sharifi's brief, this Court has an obligation to review the record for any "plain error."[9] It has come to this Court's attention that the presentence report that is statutorily required by § 13A-5-47(b), Ala. Code 1975, contains several omissions. Section 13A-5-47(b), Ala.Code 1975, states:
"Before making the sentence determination, the trial court shall order and receive a written pre-sentence investigation report. The report shall contain the information prescribed by law or court rule for felony cases generally and any additional information specified by the trial court. No part of the report shall be kept confidential, and the parties shall have the right to respond to it and to present evidence to the court about any part of the report which is the subject of factual dispute. The report and any evidence submitted in connection with it shall be made part of the record in the case."
In this case the presentence report contains no information under the sections entitled "Employers," "Treatments," or "Officer remarks." However, for the following reasons we find that these omissions were harmless.
Several mental evaluations were performed on Sharifi before trial and the circuit court had the benefit of the mental-evaluation reports. The reports contain very detailed information about Sharifi's life in Iran. Also, Sharifi had been treated in Iran for a medical condition. A letter received from Dr. Ali Baghbanian, a psychiatrist in Iran, states: "This is to certify that Mr. Mohammad Sharifi Moghaddam, with a history of medical diagnosis of hypomania and manic D.S. attacks, under medical care with drug treatment including carbonate lithium, trihexyphenidyl, biperiden, Carirazine, throdiazine and maloyderidol since 1991." (C.R. 45.) Another letter states that since the age of 25 Sharifi had been diagnosed with sleep disturbance, "flights of idea," aggression, hyperactivity, grandiosity, unstable emotion, impulse control, elevated mood, and "ideas of reference." (C.R. 46.) Also, there was evidence indicating that Sharifi had worked as an engineer in Iran. In its sentencing order the circuit court stated:
"The Court has considered all aspects of [Sharifi's] character and records and any of the circumstances that [Sharifi] offered in mitigation. It considered the testimony of [Sharifi's] father. It noted *948 that [Sharifi] was educated and apparently served in the military. He has a 12-year old son in Iran and a supportive family. [Sharifi] worked in Huntsville, Alabama, prior to leaving for California."
(C.R. 1221.) Also, at the sentencing hearing before the court the following occurred:
"[Prosecutor]: As to the issue regarding the mitigation, I think it's important for the court to note that [Sharifi] has not cooperated throughout as to mitigation. Mr. Johnston [defense counsel] testified that [Sharifi] would not be forthcoming with him as to many of the very matters that he now complains that he can't have presented."
(R. 1882.)
This Court in Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000), held that the fact that a presentence report was incomplete was not error. We stated:
"Jackson did not object to the presentence investigation report at the sentencing hearing; therefore, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
"In support of his argument, Jackson relies on Guthrie v. State, 689 So.2d 935 (Ala.Cr.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997), in which this court reversed Guthrie's sentence and remanded the case for the trial court `to reconsider Guthrie's sentence with a sufficient presentence report.' 689 So.2d at 947. In so doing, we stated:
"`This presentence report's cursory and incomplete treatment of Guthrie troubles us, because it may have hamstrung the trial court's consideration of the full mosaic of Guthrie's background and circumstances before determining the proper sentence. As such, this presentence report risked foiling the purpose of § 13A-5-47(b).'
"Guthrie, 689 So.2d at 947. `The purpose of the presentence investigation report is to aid the sentencing judge in determining whether the jury's advisory verdict is proper and if not, what the appropriate sentence should be.' Ex parte Hart, 612 So.2d 536, 539 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).
"Unlike the court in Guthrie, the trial court in this case had the opportunity to consider the `full mosaic of [Jackson's] background and circumstances' before sentencing him. In Guthrie, we were concerned with the cursory presentence report because Guthrie had not presented any mitigating evidence during the sentencing hearings before the jury or the trial court and specifically instructed his attorney not to argue any mitigation other than the fact that his role in the crime was as an accomplice; because Guthrie's personal and social history contained in the report had been taken from an interview that was conducted at least five years before his sentencing hearing and no attempt had been made to update that information for purposes of the presentence investigation; and because, although the report indicated that no psychological reports were available, the record showed that Guthrie had been incarcerated at Taylor Hardin Secure Medical Facility in 1988.
"Although we agree with Jackson that the presentence report in this case was virtually identical to the youthful offender report prepared over a year before Jackson's trial, and, like the report in Guthrie, indicated that no psychological reports were on file when, in fact, Jackson had been evaluated both at the Taylor Hardin Secure Medical Facility approximately six months before trial and *949 by his own expert only a week before trial, we find that the deficiency in the report in this case does not cause the same problem as the deficiency in Guthrie.
"In Guthrie, the court was faced with sentencing Guthrie without any current information on his background. Here, however, Jackson presented extensive mitigating evidence about his background and childhood, at both the sentencing hearing before the jury and before the trial court. In addition, the trial court had before it both Dr. Goff's and Dr. Smith's psychological evaluations containing extensive information about Jackson's life, his schooling, and his mental history. Finally, the trial court indicated in its sentencing order that it had considered this mitigating evidence in reaching its decision. Clearly, the trial court here was not `hamstrung' into determining Jackson's sentence without consideration of `the full mosaic' of Jackson's background and circumstances. See, e.g., Wilson v. State, 777 So.2d 856 (Ala.Cr.App.1999). Therefore, we find no error, plain or otherwise, as to this claim."
791 So.2d at 1033-34. See also Brown v. State, [Ms. CR-04-0293, June 29, 2007] ___ So.2d ___ (Ala.Crim.App.2007); Lee v. State, 898 So.2d 790 (Ala.Crim.App. 2001); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000); Wilson v. State, 777 So.2d 856 (Ala.Crim.App. 1999).
For the reasons stated above, we likewise find no plain error in the incomplete presentence report as it is clear that the circuit court had access to the omitted information.

Sentencing Order

XVII.
Finally, as required by § 13A-5-53, Ala.Code 1975, this Court must review the propriety of Sharifi's conviction and death sentence. Sharifi was indicted and convicted of murdering Sarah Sharifi and Derrick Brown during one act or pursuant to one course of conduct, an offense defined as capital by § 13A-5-40(a)(10), Ala. Code 1975, and punishable by death. The jury, by a vote of 102, recommended that Sharifi be sentenced to death. Our review of the record shows that Sharifi's death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The circuit court found as an aggravating circumstance that the murders were committed during one act or course of conduct, see § 13A-5-49(9), Ala.Code 1975. The circuit court found, as a statutory mitigating circumstance, that Sharifi had no previous history of criminal activity, see § 13A-5-51(1), Ala.Code 1975. Pursuant to § 13A-5-52, Ala.Code 1975, the circuit court found the following nonstatutory mitigating circumstances:
"The Court has considered all aspects of the Defendant's character and records and any of the circumstances that the Defendant offered in mitigation. It considered the testimony of the Defendant's father. It noted that the Defendant was educated and apparently served in the military. He has a 12-year old son in Iran and a supportive family. The Defendant worked in Huntsville, Alabama, prior to leaving for California. The Court gave appropriate weight to all non-statutory mitigating circumstances."
(C.R. 1221.)
Sharifi argues that the court should have found other mitigating circumstances, such as the violation of Sharifi's international rights under the Vienna Convention, "residual doubt, and mercy."
*950 "The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance." Calhoun v. State, 932 So.2d 923, 975 (Ala. Crim.App.2005). See also Ex parte Ferguson, 814 So.2d 970, 976 (Ala.2001).
Moreover, "residual doubt" is not a mitigating circumstance. "`"Residual doubt" is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty."'" Harris v. State, 632 So.2d 503, 535 (Ala.Crim.App.1992), quoting Franklin v. Lynaugh, 487 U.S. 164, 187-88, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).
According to § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating circumstances and the mitigating circumstances to determine the propriety of Sharifi's death sentence. After independently weighing those circumstances, we are convinced that death is the appropriate sentence in this case.
Sharifi argues that § 13A-5-53, Ala. Code 1975, requires this Court to independently weigh the evidence and to consider evidence in mitigation that was presented to the circuit court but not found by that court to be mitigating. We recently addressed this issue in Lewis v. State, in which we held:
"`In support of this argument, Clark asks this Court to consider a litany of mitigating circumstances that the trial court found not to exist. (See Part XIII of this opinion.) However, as this Court stated in Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1997):
"`"In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances as found by the trial court."
"`735 So.2d at 1269 (emphasis added). See also Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997). This Court cannot, as Clark urges us to do, consider mitigating circumstances not found to exist by the trial court.'
"Clark v. State, 896 So.2d 584, 657-58 (Ala.Crim.App.2000). Thus, we are unable to consider mitigating evidence not considered by the trial court."
Lewis, ___ So.2d at ___.
As required by § 13A-5-53(b)(3), Ala. Code 1975, we must determine whether Sharifi's death sentence was disproportionate to the sentences imposed in similar cases. Sharifi's sentence was not. See Ex parte Maples, 758 So.2d 81 (Ala.1999); Ex parte Freeman, 776 So.2d 203 (Ala.2000); Williams v. State, 710 So.2d 1276 (Ala. Crim.App.1996); Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988); Daniels v. State, 534 So.2d 628 (Ala.Crim.App.1985).
Last, we have searched the record for any error that may have adversely affected Sharifi's substantial rights and have found none. See Rule 45A, Ala.R.App.P.
For the foregoing reasons, Sharifi's capital-murder conviction and his sentence of death are due to be affirmed.
AFFIRMED.
BASCHAB, P.J., and McMILLAN and WELCH, JJ., concur.
SHAW, J., concurs in part and concurs in the result, with opinion.
*951 SHAW, Judge, concurring in part and concurring in the result.
I concur in all parts of the main opinion except Part VII. As to that part, I concur in the result only. See my special writing in Pruitt v. State, 954 So.2d 611 (Ala.Crim. App.2006).
NOTES
[1] Article VI of the United States Constitution states:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."
[2] More recently, the United States Supreme Court has heard oral argument in a case involving this issue. See Medellin v. Texas, No. 06-984.
[3] The motions filed by defense counsel are numbered. The last motion is number 123. The defense also filed over 30 ex parte motions.
[4] The case was placed on the court's administrative docket when Sharifi was committed to Taylor Hardin Secure Medical Facility for further mental evaluations.
[5] To protect the anonymity of the jurors we are using their initials.
[6] Sharifi also mentions another prospective juror, D.A., in this section of his brief. However, the record shows that the circuit court removed this juror for cause.
[7] This aggravating circumstance was added effective September 1, 1999. The victims were murdered in December 1999.
[8] "Pursuant to Section 16-12-102(1), 8A C.R.S. (1986), the prosecution challenges the penalty phase instructions in the death penalty cases, People v. Tenneson, No. 885A144, and People v. Vialpando, No. 885A258." People v. Tenneson, 788 P.2d. at 788.
[9] In his reply brief Sharifi purports to raise several issues for the first time, and he asks us to review them for plain error. He merely lists those issues without making an individual argument for each claim. We find that none of the named issues affected Sharifi's substantial rights; thus, they do not rise to the level of plain error.